cases number 13 1391 Mueller Comercial de Mexico against the United States. Mr. Baisberg. Thank you Your Honor. Good morning and may it please the court. I'm Yochai Baisberg and I'm here today on behalf of Mueller Comercial and Southland Pipe Nipple Company. Mueller Comercial is a producer of pipe fittings in Mexico and also produced is a reseller of the pipe that is undisputed that Mueller Comercial fully cooperated during the proceeding answering all the questions that the department asked and participating in a one-week long on-site verification. Despite that full cooperation commerce applied an adverse inference in the calculations of Mueller's anti-dumping margin. Let me tell you what the problem that I see you is having. I'm sympathetic to the notion that cooperating parties shouldn't have their margins increased as a result of adverse facts available. But what the government argues as I understand it is that there is a necessary deterrence here. That this is unlike Shenzhou where there was no relationship between the cooperating party and the AFA party. That there was no non-cooperating party to cooperate and that there was on top of that a risk that if the government did not use AFA under these circumstances that there would be a tendency to reroute the exports so that the high dumping margin of 48 percent or whatever it was could be avoided and the exports could go through Mueller having a much lower dumping margin. So those are the two problems that I see the two potential distinctions from Shenzhou. Could you address those? Absolutely I'd be glad to and let me address the second one first. In the final result that the Department of Commerce published any pipe that was exported by Turnium would be subject to the 48 percent rate and any pipe that was exported by Mueller that was produced by Turnium would be subject to the 19 percent rate. So there's absolutely nothing unusual about the fact that a producer's pipe is subject to different cash deposit rates or ultimate dumping margin. Well right but what I think Commerce is saying is that under these circumstances there would be an incentive for Turnium to stop its own imports into the United States and instead of to a high AFA rate of 48 percent. Right and the department has the tools available to it to address that which is its knowledge test and that's what they found. If Turnium has knowledge that a particular sale to Mueller is going to the United States then that sale is subject to Turnium's rate. However if Turnium has no knowledge that that particular sale to Mueller will be sent to the United States and Mueller exports some pipe that was produced by Turnium to the United States it's Mueller's rate that applies. That's the way the anti-dumping system is set up. If Commerce has a concern that that reseller policy or that reseller methodology can result in people shifting then those concerns need to be addressed up the street. How often does that happen in the in anti-dumping proceedings that there's a that Commerce says oh no you're you're this is a really a Turnium export and it's just funneled through Mueller. That evasion rationale how often does that come up? But you see it's not evasion it's exactly what Commerce found and said in Tung Mung which is that a situation where a producer sells to multiple resellers and each reseller has its own rate there's no evasion because one reseller sells to the United States versus another one. I mean this comes up I would say often if there's a whole policy at the Department of Commerce they've developed this knowledge test to determine who is the exporter and that's the critical question because dumping margins are calculated on the exporter and for Mueller's margin they looked at Mueller's U.S. sales and compared them to Mueller's home market sales. So there can and that is what dumping is it's a the Turnium whatever's Turnium sells in the home market is irrelevant to this calculation and so this notion that they're trying to close a loophole or deal with evasion it's simply not true because had they found during the invest during the review that Mueller was merely a conduit for Turnium then Mueller's and then Turnium's rate would have applied because Turnium had knowledge that the product was going to the U.S. What they found during the review is that Turnium's that Mueller further processes some of Turnium pipe it turns some of Turnium's pipe into non-subject merchandise and sell some of that pipe in the home market and some of it is clearly exported to the United States. So for any given sale Turnium does not know that the pipe it's selling to Mueller is going to the United States and thus Turnium is not the exporter to the United States. And I want to clarify something Turnium and Mueller are unrelated as defined by the statute and Commerce has never put forth an argument that they're related. They're not affiliated under the statute and they interact with each other at arm's length. What about the other argument that even though there's an arm's length relationship as you say that still a purchaser has some leverage over the supplier to get the supplier to cooperate? And Turnium did cooperate if they didn't cooperate fully but they answered the original questionnaire that was issued to them. I don't think that's a full answer to the question. No no but but but if I may Turnium put forth hundreds of pages of information on the record with respect to its cost and the limited hold that the department found was that that cost information wasn't product specific enough. That the department wanted product specificity on five characteristics and Turnium failed to do two. I understand and what what Commerce is saying is that Mueller because it's purchasing from Turnium has some leverage over Turnium to force them to fully cooperate with Commerce. What's the answer to that? The answer is that there was no finding that Mueller failed to cooperate to the best of its ability. Everybody agrees with that. Right so that there was if that's the approach they wanted to take that Mueller somehow didn't do enough in the underlying review. They fell way short of that. They expressly found that Mueller did everything that fully cooperated. Except to stop purchasing from Turnium because Turnium was not providing the full information required for the regulators. That's the point of the leverage not that you didn't independently cooperate but that as between the regulatory authorities here and you you're in a much better position to get Turnium to do what our that to engage in full cooperation with our regulatory. Well of course administrative reviews of the Department of Commerce are retrospective and so by the time the administrative review has commenced the entire period that is covered by that review has come to a conclusion. So Mueller did encourage Turnium to participate and Turnium as well as Mueller's other unaffiliated supplier submitted information that the information was not perfect. No one disputes there was a hole in the record a small hole. Can I return to the just get some clarification about the knowledge test you described. So potent Turnium said there's this 20 something percent gap in dumping rates between the reseller Mueller and our own. So we're going to shift a bunch of our supply that we ordinarily would have imported directly to sell to Mueller. We don't know where any given piece of it is going to go. Council should not be expressing opinions about questions by nodding. Please don't do that. Anyway I think you're probably getting getting getting the questions with the knowledge test be satisfied or dubiously satisfied or what if Turnium did a kind of large scale shift but had no idea where any individual pipe or segment was going to go. So your honor in that hypothetical because the knowledge test is not part of this appeal but I understand where you're getting at the way the department applies the knowledge test is on a transaction specific basis. So if they would test for any given transaction at that time did the producer know that the product they were selling to the reseller was going to be resold as subject merchandise. That I guess is what feels like it makes it a not fully satisfactory answer to the underlying policy concern about use of but again I mean it's the crux of the department's analysis is who is the exporter. Once they determine who the exporter is then that exporter gets its own dumping margin and the dumping liability for the importer is based on who that exporter was. So again if that's a concern that the department has in the macro then they need to go to Congress to fix it or to adopt a new policy but their their normal course is to define who the exporter is based on the knowledge test. And in this case they clearly found that Mueller was the exporter. So there's no shifting and we think from the preliminary results Mueller's margin was around five percent and then the final result there was it was 19 percent. The differential that exists now in the final results that they published is greater from 19 to 48 percent than the differential would be if you fixed it in the sense that if you didn't allow an adverse inference to be used in calculating a margin for a fully cooperative respondent. Okay let's hear from the other side. Thank you. Reserve my time. Mr. Adelship. May it please the court. To begin with the questions from Judge Dyke and Judge Taranto regarding the knowledge test that was raised in my friend and colleague's reply brief. The knowledge test as was conceded applies on a transaction specific basis and so it does not solve in and of itself the problem of potential circumvention of the statute. What does transaction mean in that sense? In other words the question that Commerce asks under its reseller policy is whether the producer knows that a specific sale of goods a specific transaction whether that is bound for the United States through a reseller. So as in this case Turnium knows full well after years of doing business with Mueller that Mueller is reselling Turnium products in the United States but it can close its eyes to the fact that any particular sale it doesn't know whether that's going to the United States. But there's no question that Commerce has the power to deal with the evasion and we specifically recognize that in Tung Mueller right if there is evasion. That's certainly a policy judgment that Commerce should can and should take into account when if Turnium starts using Mueller as a conduit for its own sales in order to avoid its AFA rate Commerce has tools to deal with that right. That is a limited solution to a difficult problem. No no but it has tools to deal with it right they may not you may think this is a better way to go about it but it has the authority to deal with that right. Your Honor that authority is not sufficient. Yes that yes you have the authority. There's no there's no question the knowledge test exists but how it's problematic because how does Commerce assess the knowledge of a party that refuses to cooperate altogether. It's difficult. Well but but Mueller is cooperating it you certainly can ask Mueller whether these things are being funneled as an evasion through it right. There doesn't need to be a an intent to evade the laws Turnium can simply close its eyes to wherever its products are going and simply sell all of its products to Mueller knowing full well that many of them or even most of them are bound for the United States but not knowing specifically about a particular shipment. And so the so I just I mean do you think that the knowledge test and I would or would not be potentially applicable in suppose the following facts Turnium in one year is importing X amount to the United States in the next year it drops down to near zero and the same volume has now been shifted to selling to Mueller and that amount is going to be Turnium has been selling to Mueller before and and maybe 30 percent or something comes into the United States and the other 70 percent is going to to other countries. Would a knowledge inference be possible simply by looking at the numbers the shift. Your honor I suppose that's possible but I can't speculate about those particular circumstances that really aren't at issue here. What commerce did was it interpreted its facts available authority under 1677 E to fill the information gap that was left by Turnium's missing cost of production data. This data was very important because to calculate Mueller's dumping margin accurately as the statute requires commerce needed this cost data from Turnium which was the producer of the products. Well what should what should Mueller have done or what could Mueller have done that it didn't do to force more cooperation from Turnium. The construction of the statute at issue here and commerce's selection from the facts available doesn't turn on. No you're not answering my question. Please answer my question. What else could Mueller have done to force Turnium to cooperate that it didn't do. Your honor I'm not aware of anything that they could have done short of threatening not to do business with them in the future in the future. And it's important that we recognize that this case involves the problems of not only missing information but adverse inferences against an interested party that failed to cooperate. The missing information was Turnium's missing costs. So commerce had to determine what does it know about Turnium in order to select the best information on the record to fill the gap left by the Turnium's missing costs. Well commerce already knew that Turnium had failed to cooperate in multiple consecutive reviews, had a high AFA rate and still refused to cooperate. And also despite the fact that Turnium's information that commerce had sought here regarding cost of production, Turnium declined to produce that information. But the calculation that's being made here only affects Mueller. It doesn't affect Turnium right? The cost of production information is being sought for the purpose of calculating an accurate dumping margin for Mueller. Yes. And it has nothing to do with Turnium's rate. That's right. That's a completely, that's a separate issue because Turnium failed to cooperate in providing information relevant to the calculation of its dumping margin, thus leading to the 48% AFA rate. But separate and apart from that, commerce selected Turnium as a cost of production respondent in this proceeding to provide cost of production information relevant to Mueller's dumping margin. So why wouldn't it have been more accurate to take all, instead of cherry picking the three highest tuna sales, that is where there was a departure from the sales price and cost of production? Well, without getting into the specific numbers, which are confidential, in order to select the most probative data, commerce chose those three tuna transactions because based on what it knew about Turnium, those were the most probative. You have a spectrum of deterrence purposes and not because they were the most accurate? It was both, Your Honor. They were also the most accurate. The spectrum of tuna's costs provide a range. And the question was which of tuna's costs were most probative of what was missing, Turnium's missing costs. So we had to make a judgment about which was the most probative. And commerce in making that judgment considered what it knew about Turnium. Where did commerce say that those were chosen because they were the most probative? I've read the record pretty carefully and I see commerce saying they were chosen because for deterrence purposes, not because they're the most accurate. Where did commerce say that that was the most accurate? Your Honor, we cite in the brief numerous instances in the IND memo and the AFA memo that commerce would just give me one where it says these are being chosen for accuracy rather than deterrence. Sure. Even in part for accuracy. Pardon? Even in part for accuracy. Yes. Okay. In the IND memo, JA44, the selected facts available are intended to produce an accurate non-punitive dumping margin for Mueller. And also on the same page, JA44, the IND memo, that it states that Turnium has withheld, I'm sorry, application of an adverse inference only to the missing cost of production information that Turnium has withheld is a reasonable and limited inference based on the information on the record that ensures Turnium does not benefit from its failure to cooperate and also avoids an adverse inference. I don't know for sure if Mueller's margin would have been higher if Turnium had actually cooperated. Yeah, but what you say on page 50, for example, it says we find the other tuna cost differentials are not sufficiently high as to effectuate the purposes of facts available rule. I do not find that any of these differentials are high enough to encourage participation in future segments of the proceeding, which sounds like rejecting the other data because it wouldn't accomplish the deterrence rationale, rather than rejecting the other data because it would not be accurate. Your Honor, in this particular case, Commerce considered all of the statutory goals, fairness, accuracy, encouraging cooperation with data requests, as well as deterrence, and concluded that each of those statutory goals... That's a general answer, but the quote that I read you says, we can't use this other data because it's not sufficiently deterrent. It doesn't say we can't use this other data because it would lead to an inaccurate result. Am I right? No, Your Honor. I believe Commerce also stated that the other tuna data was less probative of the missing Turnium costs as well. Where does it say that? Excuse me, bear with me just one moment, Your Honor. Commerce explained in the review that it had assigned Turnium a total AFA rate of 48% in the prior review, and this hadn't induced Turnium to cooperate during the current review, leading Commerce to conclude that Turnium had refused to cooperate in this case to provide its missing cost data because its data would have been less favorable. So what Commerce tried to do was to avoid the unfairness of Mueller receiving an artificially low rate just because Turnium had refused to cooperate. Part of the overall decision was consideration of all of the statutory goals. Do you still wish to save time for the other defendants, or can you tell us more to elaborate on these points, which obviously are concerning? I would like to just wrap up quickly so that I can get my colleagues to comment. We're losing their time, but it's up to you as to how you use it. Okay. Well, respectfully, Your Honor, I had agreed to give them the time. So in summary, Commerce's decision-making here as the trial court held was thorough, thoughtful, logical, and complete, and we respectfully request that the court affirm the trial court's well-reasoned judgment that Commerce's decision is both lawful and reasonable. Thank you. All right. Thank you. Ms. Schneider? May it please the Court, I'll be very brief. First, there was the question, does the adverse inference that Commerce applied in this case, did it affect only Mueller? And the answer to that is no. It affected Turnium. Turnium had a very direct interest in achieving as low as possible a dumping margin for Mueller as it could. And the reason for that is that the lower Mueller's dumping margin, the greater the access Turnium would have to the U.S. Mark, isn't it a question of motivation? It's a question of what happened? Yes. But the point is that as soon as a higher margin for Mueller is implemented, that does not only have an effect on Mueller, it also has an effect on Turnium. But it has no effect in terms of the calculation of any dumping margin applicable to Turnium. Not to Turnium's direct exports, no. But the other point that I would like to make is that on the knowledge test, the Department's policy is very clear that generalized knowledge that some sales are going to go to the U.S. market is not enough to attribute the sales to the manufacturer. They then become the sales of the reseller. And in addition to that, I would just like to say that we discussed this at length in our brief. This case tracks very closely the situation in the KYD case. And finally, if I may, I would just like to say a very brief word about the fine furniture case, which is a related case that is currently before the court. This case provides an even stronger basis for the use of adverse facts than fine furniture. The unity of interest between... I think let's stick with this case. Very good. Can I just ask you the question that I think we were discussing at the end of Mr. Adelschick's argument? Start at the point at which the Commerce says, we don't have certain information from Turnium, we're going to look at Tuna. And now it looks at Tuna and it says it's got this range of different costs. And one thing it thinks is it would be a good idea to choose the worst of those because that would induce better behavior. Put that aside. Is there anything else that Commerce said in choosing among the range of Tuna costs to indicate that we think the ones that we chose, these three, are actually a better indication of the missing Turnium costs information than the ones we didn't choose? Well, I think Commerce was trying to do two things. Number one, they had no information about Turnium's missing costs, so they were trying to they saw that by... I think what you just said is not responsive at all to my question. I apologize. Is there anything besides deterrence that Commerce said to indicate that the three Tuna costs they chose, that they thought that those were more accurate on any basis than the ones they did not choose? I'm not aware of anything other than Commerce's general statement that they were attempting to come up with an accurate margin for Mueller because they didn't have Turnium's costs. And the other thing that I want to mention is that in the prior review, Turnium had an adverse facts available rate of 48%, and Mueller knew about that rate and was certainly in a position to choose not to have Turnium as its supplier. Thank you, Your Honor. Thank you, Ms. Schneider. Mr. Chagrin. Good morning, Your Honors. May it please the Court, Roger Chagrin on behalf of the Asserted Defendant Intervenors. We'll rest the base on our briefs. I would make one point that hasn't been made by my co-counsel thus far. Judge Dyke, you wrote for this Court in SKF that the statute clearly gave Commerce the authority to utilize suppliers' records for cost of production when looking at an exporter. I would submit to this Court... That's not an issue here, is it? Yes, it is, because I would submit to this Court that if you overturn the lower court's decision in this case, that essentially you will be eviscerating your decision in SKF because there will be no... I'm not following that. Let me So nobody's saying they can't use the supplier cost. The question is, which transactions should they be looking at? Can they cherry-pick the transactions to use the three worst ones? And they can to draw an adverse inference. And I submit to this Court that if you say that Commerce cannot draw an adverse inference under the statute to the interest of the foreign supplier that doesn't cooperate, then in review after review, case after case, those foreign suppliers will say, if my cost of production is higher than my selling price to the exporter, I will be advantaged because the Court has said it can't use an adverse interest to me, the supplier, if I don't supply my cost. There will be no reason for those foreign suppliers... Those can use an adverse inference against the supplier. In fact, Turnium here got a 48% dumping rate as a result of AFA, right? And nobody's challenging that. Yeah, but not as to the exports made by Mueller of Turnium's products. If Commerce cannot utilize something adverse in determining Turnium's costs, then Mueller will get a lower rate, as Judge Sharanto was asking earlier. It's impossible under the knowledge test. Under his hypothetical, let's say Turnium had been selling 25,000 tons directly to the U.S. and gets hit with a 48% duty, and it previously sold 50,000 tons to Mueller, which exported 25,000 tons. In the next year, it sells 75,000 tons to Mueller, which exports 50,000 tons. But it says, we don't know among those 75,000 tons, which of those are going to be the 50,000 tons. I can tell you under the knowledge test, there is no way that Commerce can say, well, we look at the total for knowledge to be specific to the transactions. They can't apply a generalized test of looking at total exports. So this case is very important to Commerce's ability to require that foreign suppliers cooperate in investigations by supplying cost of production information when an exporter is the facts of this case, and it's very important to Commerce's ability to obtain that information in the future. Can I just ask, at the risk of sounding like a broken record, are you in the same page as I'm inferring from your colleagues that this rests just on deterrence? Yes, I believe this rests upon deterrence against Turnium for not providing the information that was requested. Okay. Thank you. Thank you very much. First, I'm perplexed why a 30 percentage point differential between 48% and 19% is less problematic than if they didn't use adverse inference and we got a 5% margin. So that would only be a reduction of 15 percentage points. So this talk about diversion and all that, I think really is just smoke. Commerce has clear discretion under its reseller policy. We use the knowledge test as shorthand and I apologize for that. It's not actual knowledge. What Commerce has found is that the producer has to have actual knowledge or reason to know. And Commerce certainly has the tools available to review information. But it's still in some sense transaction specific. Because that's the way Commerce has decided it wants to is a lack of accuracy and a fundamental substantial evidence problem. Because Commerce states that it applied a neutral, non-punitive, non-adverse inference to fill the gap in Mueller's calculation. And at the same time as Judge Dyke, you identified, they're saying the methodology to fill that gap, which they claim was neutral, was adverse. And they clearly state that methodology they pick, they cherry pick three transactions in order to come up with an adverse number. That is a fundamental tension that cannot be reconciled. And it is fundamentally unfair that a fully cooperative respondent like Mueller faced the consequences for that step. If Commerce had concerns about the information that Turnium submitted, Turnium was a mandatory respondent, they had a direct vehicle to go after them. That's why this case is very similar to SKF. In SKF, this court acknowledged the lower court's finding that it is unfair to use an adverse inference against a fully cooperative respondent due to the non-cooperation of an unaffiliated supplier. In that case, the unaffiliated supplier was not even a party before Commerce. Here Commerce had a direct mechanism to go after the party that they want to induce cooperation from. And this notion that Turnium hasn't cooperated in the past, that's true, but in the preceding review. But in the review that is at bar, they provided cost information. It was imperfect cost information. They submitted three times the information to the department and they answered two sets of follow-up questions. There is no doubt that there is information about Turnium's cost on this record. It's not product specific and we understand that. What does Commerce do? Does they look at Tuna's cost and say what are the differences between the products? No. Do they look at Mueller's acquisition cost, which are non-questionably an arms-length transaction and say, okay, Mueller, when you're at arms-length with Turnium, what's the differential between the products you buy? No. They cherry-pick three transactions, a minuscule amount, I can't say the number because it's confidential, and apply that aberrational difference to all of them. They don't want to use in the calculation. So the irony here is they say we will not use Mueller's acquisition cost because we want the supplier's cost. The supplier provides the cost, albeit imperfect, and then because of the imperfection, we're not going to use any of the supplier's cost. We're just going to use the cost that we said we didn't want to use, which was Mueller's cost. And I submit that that is a fundamental substantial evidence problem. I would also say that there have been cases where the department has looked at product shifting and volumes as between people to find circumvention. I think there was a case involving sweaters from Taiwan that the department used that approach. So it's not that the department is without tools to address what they purport to be their concern, but it is fundamentally unfair to subject Mueller to an adverse inference. And the mere fact that they say they did not does not change the reality of the situation because Mueller's dumping margin calculation was based on costs that were inflated by an adverse inference, and those weren't Turnium's costs. They were Mueller's costs that were submitted, which the department asked multiple questions about, which Mueller responded and were never found to be inaccurate. Can you just recite, and I think the word again, because I know you've done it, but maybe just a tiny bit slower, even though your time's about to run out. If in looking at Tuna's costs, they hadn't been interested in deterrence, what should they have done in selecting what they thought the best analogy would be? Yeah. I think there's two things they could have done. They could have looked at all of Tuna's cost of production, compared it to all of the products that Mueller purchased from Tuna in the aggregate basis and say, on average, did Mueller pay more or less than Tuna's cost of production? And if, as we submit in our briefs, the record shows that Mueller paid more than what the cost of production was for Tuna, which makes sense in an arm's length transaction, then there's no need to adjust Mueller's acquisition costs for the product that's purchased from Turnium. Another option would have been to look at Tuna's costs and the relative cost differences between products and perhaps use that. I think that on the record, there are multiple neutral facts available. Did you all submit to Commerce argument evidence that you as purchaser understood that these Tuna products were the ones most close to these Turnium ones? No, absolutely not. Well, let me put that when you meant these products, if you meant the top three that they select. No, no. The range of 23 plus three, if that's the range. Yeah, yeah. So the information that's provided both by Tuna and Turnium and by Mueller, too, describes the product so that Commerce has on the record the physical characteristics of what was purchased from Tuna, the physical characteristics of what was purchased from Turnium, and could have done a more even-handed and neutral comparison and not cherry-pick three products purely because they were the highest products. That's the reason they picked it. It's not fairness. It's not accuracy. It's they picked the three products that generated the highest margin for them. I don't see my time. Any more questions? Okay. Thank you. Thank you very much. Thank all of you. The case is taken under submission.